ELIZABETH M. FINK
ATTORNEY AT LAW
13 GAY STREET
NEW YORK, NEW YORK 10014
(718) 783-3682 ✯ (718) 783-5853 (fax)

**SARAH KUNSTLER**
**GIDEON ORION OLIVER**
*Of Counsel*

January 4, 2008

The Honorable Deborah A. Batts
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

              Re: U.S. v. Kwame Prempeh
                  07. Cr. 311 (DAB)

Dear Judge Batts:

    We respectfully submit this letter to memorialize our objections to the Pre-Sentence Report ("PSR") and to urge that this Court, after considering both the Guidelines and the factors delineated in 18 U.S.C. 3553(a), sentence Mr. Prempeh to the 2-year mandatory minimum.

    **I.**    **GENERAL OBJECTIONS TO THE PRE-SENTENCE REPORT**

        **a. Failure of Probation to Provide Time to Object**

    We received the PSR from Probation after business hours on December 15, 2007. Even though there is no date set for sentence, Probation submitted a final PSR, without providing the parties with an opportunity to submit objections as mandated by Rule 32 of the Federal Rules of Criminal Procedure.

    Probation has failed to provide the defense with adequate

Hon. Deborah A. Batts
January 4, 2008
Page 2 of 20

notice and disregarded our right to correct false information and supplement the record with pertinent materials required to present the defendant's "history and characteristics" and the other sentencing goals and factors. We object to this procedure and submitted our objections and corrections to Probation on January 2, 2008.

### b. Probation's Sentencing Recommendation is Unconstitutional and the PSR Itself Violates 18 U.S.C. § 3553

Our objections to the PSR go far beyond Probation's failure to provide the defense with time to protest its various inaccuracies. More than two years have passed since the Court's instruction in U.S. v. Booker, 543 U.S. 220, 245 (2005) that district courts must read the United States Sentencing Guidelines as "effectively advisory," rendering the formerly mandatory Guidelines one factor among several courts must consider in determining an appropriate sentence in accordance with 18 U.S.C. §3553(a).

Nevertheless, the PSR in this case flatly fails to consider the sentencing goals articulated in 18 U.S.C. 3553. The only information included in the 16-page, 72-paragraph PSR regarding Mr. Prempeh's personal history and characteristics is information Mr. Prempeh himself provided. (See paragraphs 18-19 and 37-41 of the PSR.) Rather than analyzing any of that information or performing research with a view toward assisting the Court in evaluating the impact of non-Guidelines factors on Mr. Prempeh's potential sentence, Probation has made unilateral findings of fact that enhance the Guidelines range beyond what was agreed to by the parties pursuant to a plea agreement.

As a result, Probation's recommended sentence parrots its calculation of the guideline range and recommends a sentence within that range without analyzing or providing information that will assist this Court in determining whether a sentence within the Guidelines is "sufficient, but not greater than necessary to accomplish the goals of sentencing" in accordance with 18 U.S.C. §3553(a).[1]

---

[1] As discussed below, Probation's own regulations do not require officers to consider 3553 factors. Instead, absent a finding of extraordinary circumstances, officers must recommend a guidelines sentence.

Hon. Deborah A. Batts
January 4, 2008
Page 3 of 20

    For those reasons and as explained more fully below, the sentencing recommendation is therefore unconstitutional under the principles of Booker, as reaffirmed and explained in the United States Supreme Court's recent holdings in Kimborough v. United States 2007 U.S. LEXIS 13082 (December 10, 2007), and Gall v. United States, 2007 U.S. LEXIS 13083 (December 10, 2007).

    In Kimborough, the Court reaffirmed that 18 U.S.C. §3553, "as modified by Booker, contains an over-arching provision instructing district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing, including to reflect the seriousness of the offense," "to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." Kimborough, *supra*, at *30-31, citing 18 U.S.C. §3553(a). The Court held that the federal guidelines for cocaine sentencing are advisory only, and that a judge may find that a sentence within the Guidelines range is "greater than necessary" to serve the objectives of sentencing under 18 U.S.C. § 3553(a).

    In Gall, the Court overturned the Eighth Circuit's ruling that a below-Guidelines sentence would be reasonable only if justified by "extraordinary circumstances," further clarifying how sentences should be calculated post-Booker. Citing United States v. Rita, the Court held that, while a Guidelines calculation is the starting point of a judge's sentencing determination, the judge must consider all of the factors under 18 U.S.C. §3553(a). In so doing, the Court made clear, a sentencing judge "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Gall, *supra* at *12 (internal citations omitted).

    The Supreme Court's directives in Booker, Gall and Kimborough beg the question: What is the role of Probation and what is the purpose of the Pre-Sentence Report in the post-Booker sentencing process? If the purpose of the Pre-Sentence Report is to provide the sentencing judge with mathematical Guidelines calculations, and to assist the Court by providing a starting point for its sentencing analysis, then the PSR should not include a sentencing recommendation.

Hon. Deborah A. Batts
January 4, 2008
Page 4 of 20

If, on the other hand, the purpose of the Pre-Sentence Report is to do an analysis of the appropriate sentence and to provide a sentencing recommendation, that recommendation must be based on the same analysis required by 18 U.S.C. § 3553 and the Court's clear edicts in Booker, Gall and Kimborough. In that case, Probation must consider the goals of sentencing as articulated in 18 U.S.C. § 3553 and recommend a sentence that is sufficient but no greater than necessary to accomplish those goals.

Because the PSR submitted by Probation in this case does a Guidelines calculation and recommends a sentence within that calculation without conducting the analysis required under Booker, Gall and Kimborough. The PSR is therefore flawed, misleading, unhelpful to the Court and the parties, and violates the defendant's Sixth Amendment rights.

### i. Rule 32 of the Federal Rules of Criminal Procedure

18 U.S.C. § 3552 requires Probation to make the pre-sentence investigation of a defendant that is required pursuant to F.R.C.P. Rule 32(c). According to Rule 32, the purpose of a Pre-Sentence Report is to apply the Advisory Sentencing Guidelines.[2] Specifically, Rule 32 instructs Probation to do a Guidelines calculation and to identify "the appropriate kind of sentence," including "any basis for departing from the applicable guidelines range." Rule 32 (d)(1) Fed.R.Cr.P.

Rule 32 does not comport with Booker, Gall or Kimborough, and its rigid application in this case and cases like it violates the Sixth Amendment. Although Rule 32 as it is currently written acknowledges that the Guidelines are now advisory, it does not acknowledge that the Guidelines are one among several factors courts must consider in determining an appropriate sentence, and it does not instruct Probation to

---

[2] Under Rule 32(d)(1) - Applying the Advisory Sentencing Guidelines - the pre-sentence report must: (A) identify all applicable guidelines and policy statements of the Sentencing Commission; (B) calculate the defendant's offense level and criminal history category;(C) state the resulting sentencing range and kinds of sentences available; (D) identify any factor relevant to: (i) the appropriate kind of sentence, or (ii) the appropriate sentence within the applicable sentencing range; and (E) identify any basis for departing from the applicable sentencing range. Rule 32(d)(1) Fed.R.Cr.P.

Hon. Deborah A. Batts
January 4, 2008
Page 5 of 20

make an individualized assessment of an appropriate sentence based on the facts presented, or to reach a determination of a sentence that is sufficient, but not greater than necessary.[3]

Although under Rule 32 the report must also contain "the defendant's history and characteristics," there is no requirement that Probation evaluate this information in light of 18 U.S.C. 3553(a). As recently amended on December 1, 2007, Rule 32(d)(2)(F) now states that the Pre-Sentence Report "must" include "any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a)." According to the Advisory Committee Notes on the 2007 amendments, the amendment to 32(d)(2)(F) "makes clear that the court can instruct the probation office to gather and include in the PSR any information relevant to the factors articulated in § 3553(a)." (See 2007 Notes of the Advisory Committee.) This means that the PSR is not required to include information relevant to 18 U.S.C. §3553(a) absent instruction from the Court.

If Probation is not required to consider the goals of sentencing as articulated by 18 U.S.C. § 3553(a), then Probation cannot make a constitutional sentencing recommendation under Booker, Gall, and Kimborough.

### ii. Probation's Stated Position on Its Role and Method of Analysis

**Probation's Role**

Probation's policies on its role in sentencing and the purpose of a Pre-sentence Report are set forth in *The Presentence Investigation Report*, Publication 107 of the Office of Probation and Pretrial Services (hereinafter "Publication 107").[4] Publication 107 was created to provide

---

[3] The anachronistic pre-Booker analysis promoted by the current formulation of Rule 32 is underscored by the use of the word "departing." The concept of a departure presumes that the Guidelines are reasonable but for a particular set of extraordinary circumstances. This is precisely the perspective explicitly rejected by the Court in Gall.

[4] Office of Probation and Pretrial Services, "The Presentence Investigation Report" Publication 107; Rev. March 2006. Quoted portions attached as Exhibit A. The entire publication is available online at: http://www.fd.org/pdf_lib/publication%20107.pdf

Hon. Deborah A. Batts
January 4, 2008
Page 6 of 20

guidance to probation officers "working in a post-Booker sentencing system," see Exhibit A, p. i-1.

According to Publication 107, "The aim of the presentence investigation is to provide a timely, accurate, objective, and comprehensive report to the court. The report should have enough information to assist the court in making a fair sentencing decision and to assist corrections and community corrections officials in managing offenders under their supervision." (Exhibit A, p. I-1). Publication 107 further states that "[t]he report is designed to provide the court with a complete and concise picture of the defendant." (Exhibit A, p. I-2).

In the PSR submitted in this case, Probation has failed to comply with its own stated goals. The PSR is by no means comprehensive, and does not provide a complete and concise picture of Mr. Prempeh. These deficiencies are discussed more fully below, where we outline our specific objections to the quality of information contained within the PSR, as well as the information omitted by Probation.

**Probation's Method of Analysis of the Appropriate Sentence**

In a section entitled "Custody," Publication 107 states that if a term of imprisonment is recommended by the Guidelines, "the officer will generally select a term of months within the advisory guideline range." (Exhibit A, p. V-5.) The section goes on to explain the method of analysis to be performed by the officer in determining the appropriate sentence:

> In deciding a point within the range to recommend, it may help the officer to visualize a continuum. Defendants with more aggravating factors and presenting a high-risk recidivism and/or danger to the community should have sentences falling toward the high end of the guideline range. Defendants with more mitigating factors and presenting low risks should fall toward the low end of the range. Departures are reserved for extraordinary cases at either end of the guideline range that can be supported by the policy statements. Sentences outside of the guideline system will rarely be recommended by the officer. (Exhibit A, p. V-5.)

Hon. Deborah A. Batts
January 4, 2008
Page 7 of 20

The method of analysis employed by Probation pursuant to Publication 107 is clearly at odds with the Supreme Court's mandate in Booker, Gall and Kimborough. In particular, Gall specifically repudiated the notion that a sentence outside of the Guidelines must be justified by extraordinary circumstances. See Gall, *supra*, at *8. Gall further rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." Id.

According to Probation's own handbook, this is precisely the type of rigid, mathematical analysis that Probation applies in determining whether to recommend a sentence outside of the Guidelines. By requiring officers to see the Guidelines as a continuum, and absent extraordinary circumstances, to recommend a sentence within that range, Probation does little more than parrot the Guidelines.

Probation's approach comes "close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range," (Gall, *supra* at 8) and therefore violates Mr. Prempeh's Sixth Amendment rights. The Supreme Court could not have intended that there be one constitutionally mandated type of analysis for courts, and another standard of analysis for Probation. Constitutional considerations aside, if Probation's role is to assist the court in making a sentencing determination, it makes no sense that Probation should employ a different calculus than the Court in arriving at a sentencing recommendation. This practice obfuscates more than it makes clear, and in no way aids the Court in its analysis.

Determination of the appropriate sentence requires individualized analysis of the factors outlined in 18 U.S.C. §3553(a), and arrival at a sentence that is sufficient but no greater than necessary. In this PSR, and by the terms of its own handbook, Probation has proven itself unequipped and unwilling to perform this analysis. Given Booker and the line of cases following, it is our position that Probation's role should be limited to a calculation of the advisory Guidelines range.

## II. SPECIFIC OBJECTIONS TO THE PRE-SENTENCE REPORT

### a. The Offense Conduct

#### i. The Loss Amount

We object to paragraphs 9, 11 and 16 of the PSR in their entirety. These paragraphs contain charts detailing orders that were allegedly placed and losses that were allegedly suffered as part of the offense conduct in this case.

Mr. Prempeh has pled guilty to conspiracy to commit wire fraud, conspiracy to commit access device fraud, and aggravated theft pursuant to a plea agreement. In the plea agreement, the parties stipulated that the loss amount exceeded $120,000, and that the restitution amount, "representing the amount of proceeds obtained as a result of the offenses charged" was $125,000. (See Plea Agreement.) However, the PSR assigns culpability to Mr. Prempeh for causing over $200,000 in losses.

In arriving a loss amount in excess of $200,000, Probation has taken information allegedly provided an investigator with the United States Postal Service by unnamed representatives of Dell Computers, Chase Bank, and Hewlett Packard, as well as information apparently provided by a cooperating witness (the "CW"), and made its own determination about the weight and sufficiency of that information, and how it may or may not apply to Mr. Prempeh.

The charts in paragraphs 9, 11, and 16 list various dollar amounts of loss allegedly suffered by both individual and corporate victims. The PSR's analysis does not explain how these loss amounts were arrived at, and contains no indication of which orders resulted in actual loss or whether Mr. Prempeh was involved in any of the alleged transactions described in it. Simply put, there has been no evidence presented to support the allegations of loss outlined in the PSR, nor has the defense had an opportunity to review, assess, or challenge any purported information relied on by Probation in making these representations regarding the alleged orders or loss amounts.

The defendant has been robbed of an opportunity to make a meaningful assessment regarding the alleged losses. Nor will

Hon. Deborah A. Batts
January 4, 2008
Page 9 of 20

a finder of fact make a determination regarding the credibility of witnesses or the sufficiency of evidence. Under these circumstances, it is clearly inappropriate for Probation to utilize this information or include these charts in the report, and they should be stricken.

### ii. The CW's Allegations – Mr. Prempeh's Role

We further object to the allegations contained in paragraph 13, which includes information provided to Probation from the CW. Although the CW's name is not mentioned in the PSR, his identity is no secret. The CW played a major role in this conspiracy, which included many other members aside from the CW, Mr. Prempeh, and Mr. Gles. While Mr. Prempeh has admittedly played some role in the conspiracy, there has been no finding of fact that he is responsible for the level of involvement ascribed to him in paragraph 13 of the PSR.

While Mr. Prempeh helped the CW and others place orders for laptops and to order credit cards, he was not in charge of any of the orders, nor was he involved with anything like all of them. Mr. Prempeh did not provide credit cards to accomplices, or instruct accomplices to pick up laptops or to purchase electronics. In fact, the majority of the tasks ascribed to Mr. Prempeh and Mr. Gles in paragraph 13 of the PSR were in fact done by the CW himself, who had a longer term of involvement with the conspiracy, and a larger role than Mr. Prempeh.

Incredibly, Probation purports to have made a conclusive factual determination regarding Mr. Prempeh's alleged role in the conspiracy relying primarily or entirely on unsubstantiated - and unchallenged - information apparently provided by the CW.

The CW was an accomplice in the crime and is receiving a benefit from the government for supplying evidence against Mr. Prempeh. The report, however, mentions neither of these facts. After reading the PSR, one might assume that the CW was disinterested bystander with nothing to gain from providing fraudulent information.

The Supreme Court has determined that the preponderance of the evidence standard satisfies due process requirements at sentencing. See, e.g., McMillan v. Pennsylvania, 477 U.S.

Hon. Deborah A. Batts
January 4, 2008
Page 10 of 20

79 (1986). While the Court is not bound by the Federal Rules of Evidence at sentencing in considering whether a fact has been proven by a preponderance of the evidence, information should have a "sufficient indicia of reliability to support its probable accuracy." <u>See</u>, <u>U.S.S.G. §6A1.3</u>, <u>comment</u>. By presenting information provided by the CW without mentioning details of the CW's role in the offense or the CW's status as a government cooperator, Probation obfuscates the truth, abuses its role, and betrays a partisanship and lack of objectivity that calls the entire PSR into question.

Furthermore, any information provided by the recordings mentioned in paragraph 14 could in no way have conclusively established the level of involvement reported by the CW, or Mr. Prempeh's involvement in every order listed in paragraph 9 - facts that any competent counsel would elicit in the context of a hearing or trial.

Although Probation is not and cannot act as a fact-finder with respect to sentencing, it has acted as one in this case. It is inappropriate for Probation to include the allegations we complain of as if they were proven fact. Accordingly, the charts in paragraphs 9, 11 and 16, and the information provided by the CW as reported in paragraph 13, should be stricken from the report.

### b. Probation's Calculation of the Offense Level

Mr. Prempeh pled guilty to conspiracy to commit wire fraud, conspiracy to commit access device fraud, and aggravated theft pursuant to a plea agreement. In the plea agreement, the parties agreed that the loss amount exceeded $120,000, and that a 10-level increase was warranted pursuant to U.S.S.G. §2B1.1(b)(1)(F).[5]

---

[5] In the plea agreement, we agreed to a 2-level increase pursuant to U.S.S.G § 2B1.1(b)(2)(A) because the offense involved 10 or more victims an enhancement. However, it is worth noting that the definition of "victim" and "actual loss" for purposes of U.S.S.G §2B1.1(b)(2)(A) is currently on appeal in the 2nd Circuit. In this case, the actual pecuniary loss was suffered by five corporations (Dell, Hewlett Packard, Discover, Chase, and Citibank). While there were more than ten people harmed by the identity theft, their actual pecuniary loss is minimal if not non-existent, as they were restored to the condition they were in prior to the theft.

Hon. Deborah A. Batts
January 4, 2008
Page 11 of 20

We object to Probation's assessment of a loss amount greater than that stipulated to by the parties, and to a 12-level increase based on that finding.

Probation has apparently based its finding with respect to loss on private conversations with employees of Chase bank, Dell, Computers and Hewlett Packard, and other unspecified information provided by the Case Agent (See PSR §§ 9, 10, 11, 12 & 57). The defense has had no opportunity to review, assess or challenge this evidence. This untested alleged information has not been and will not be put before this or any other Court.

For the foregoing reasons, we object to Probation's assessment of the loss amount and of the defendant's offense level, and ask that the PSR be amended to reflect loss amount and offense level calculation agreed to by the parties in the plea agreement.

### c. Probation's Calculation of the Restitution Amount

We object to the calculation of the restitution amount in paragraph 70. Pursuant to the plea agreement, the parties have agreed to a forfeiture amount of $125,000 "representing the amount of proceeds obtained as a result of the offenses charged" in the indictment. Irrespective of this, Probation has determined the full restitution amount to be $211,578.80. We have not been provided with any information detailing how this figure was calculated other than the charts in paragraphs 9, 11, and 16 that we objected to above.

18 U.S.C.S. § 3664(e) provides that the burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the Government. 18 U.S.C.S. § 3664(e). Because the parties have stipulated to the amount of the loss pursuant to a plea agreement, the PSR's calculation of the restitution amount in paragraph 70 violates Mr. Prempeh's constitutional rights and should be stricken.

### d. Other Errors and Omissions

In paragraph 3, Count 2 is incorrectly referred to as "Bank Fraud." Mr. Prempeh pled guilty to conspiring to violate 18 U.S.C. 1029(a)(5), which provides criminal penalties when a defendant "knowingly and with intent to

Hon. Deborah A. Batts
January 4, 2008
Page 12 of 20

defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000." See 18 U.S.C. 1029(a)(5). Nowhere in 18 U.S.C. 1029(a)(5), the indictment, or the plea agreement is this crime referred to or classified as "Bank Fraud." Therefore, any reference to "Bank Fraud" should be stricken from the PSR.

On the cover page and in paragraph 55, the PSR states that the maximum term of imprisonment for Count III is life. 18 U.S.C. 1028A sets forth a two-year term of imprisonment to run consecutively to any other term of imprisonment, but does not set forth a maximum. The position of both the defense and the government is that maximum term of imprisonment under 18 U.S.C. 1028A is two years. Pursuant to the plea agreement, the stipulated maximum term of incarceration is 29 and one half years. At Mr. Prempeh's plea, Judge Gorenstein stated on the record that the maximum term of imprisonment is 29 and one half years. The PSR should be amended to reflect this fact.

Because the maximum term of imprisonment for Count III is two years and not life, Count III is not a Class A Felony. Therefore, any and all references to Count III as a Class A Felony should be stricken (see paragraphs 64 and 66, and the cover page of the PSR), and Count III should be reclassified as a Class E Felony pursuant to 18 U.S.C. 3559.

Furthermore, pursuant to 18 U.S.C. 3582(b)(3), the maximum term of supervised release for Count III is not more than one year, and the PSR should be modified to reflect this fact (see paragraphs 59, 62, and Sentencing Recommendation).

In paragraph 18, the PSR states that Mr. Prempeh is fearful of returning to Ghana because the Government will chop off his wrists if they learn of his conviction. That is not accurate. Mr. Prempeh fears that his hands will be chopped off by the leaders of the Sunni Muslim Community to which his family belongs. These leaders dispense punishment to members of the community based on Sharia, which is Islamic religious law.

In paragraphs 48 and 49, the name that Mr. Prempeh used to work is inaccurate. In both paragraphs, it should read

Hon. Deborah A. Batts
January 4, 2008
Page 13 of 20

"Gideon Annor."

    In the section entitled "Family and Personal Data" at paragraphs 31-41, the PSR fails to mention the fact that Mr. Prempeh's mother has sickle cell anemia and has worked sporadically due to illness. The PSR also omits consideration of the family's conversion to Islam. As Mr. Prempeh mentioned during his pre-sentence interview, the family was destitute and struggling to survive, when they met a local Islamic preacher. The preacher helped the family by providing them with money for food and medical care that Mr. Prempeh's mother desperately needed. After receiving this support from the preacher, the family converted to Islam. As part of an orthodox Islamic community, the family is governed by religious leaders who mete out punishment on the basis of Sharia law.

### III. **THE ENTIRE PRE-SENTENCE REPORT SHOULD BE STRICKEN**

    For the above reasons, we respectfully request that the entire Pre-Sentence Report be stricken because it violates the defendant's constitutional rights. In the alternative, we ask that Probation be ordered to answer our objections, corrections and additions, and to prepare a subsequent PSR that takes these factors into account.

### IV. **AN EXAMINATION OF THE SENTENCING FACTORS ENUMERATED IN 18 U.S.C. 3553 UNDERSCORES THE FACT THAT TWO YEARS WOULD BE THE JUST AND APPROPRIATE SENTENCE**

    Under 18 U.S.C. §3553, this Court, in its determination of a sentence that is "sufficient, but not greater than necessary," shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant." In addition, the sentence must comply with a number of stated purposes listed in paragraph 2 of the subsection.[6]

---

[6]     They are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the

Hon. Deborah A. Batts
January 4, 2008
Page 14 of 20

There is no question that Mr. Prempeh committed a serious crime, and that a term of imprisonment is warranted. However, in this case, the circumstances of the offense and the characteristics of this defendant underscore the appropriateness of sentencing Mr. Prempeh to the two-year mandatory minimum under 18 USC § 1028A.

### a. Mr. Prempeh's Childhood

Kwame Osei Prempeh is 21 years old, and was born on December 15, 1986 in Accra, Ghana in a community called Mamobi. He has two younger twin siblings, Deborah and Aborah, a girl and a boy, who were born on March 14, 1994 and are 13 years old.

Mr. Prempeh and his siblings were raised by their mother, Abena Ofori. Mr. Prempeh's father, Osei Prempeh, abandoned the family when Mr. Prempeh was about seven years old, shortly after the birth of the twins. Although Osei Prempeh told his family that he was going to the United States to earn money for their support, the family never heard from or saw Osei Prempeh again, and did not receive any financial assistance.

Mr. Prempeh was raised in dire poverty. The family lived in a rented one-room shack. Ms. Ofori suffers from sickle cell anemia, and was often unable to work. When Ms. Ofori was ill, there was often little or no food to eat, or enough clothing for all three children. The deprivation was so great, that Mr. Prempeh's strongest memory from childhood is the feeling of hunger.

When Ms. Ofori was well enough to work, she offered her services as a day laborer on nearby farms, and purchased some of the produce she harvested to sell at a local marketplace. But her frequent sickness made her an unreliable worker, and many farmers refused to hire her.

After his father's abandonment, Mr. Prempeh became the male head of his household. Although he was only a child, Mr. Prempeh felt responsible for the well being of his family. When he was about 9 years old, Mr. Prempeh went to work

---

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Hon. Deborah A. Batts
January 4, 2008
Page 15 of 20

selling newspapers in the street to support his mother and the twins.

Soon after his father left, Mr. Prempeh's family converted to Islam. The family was destitute and struggling to survive when they met a local Islamic preacher, who helped the family by providing them with money for food and medical care that Mr. Prempeh's mother desperately needed. After receiving this support from the preacher, the family converted to Islam.

Mr. Prempeh was a bright child. He loved learning and was good in school. After his father left, Mr. Prempeh transferred from a private elementary school to a public elementary school because the family was unable to afford the tuition payments. Mr. Prempeh's new school was under-funded and poorly resourced. Overcrowding was so severe that the school held double sessions. Students received a half-day of schooling each day, either in the morning or afternoon.

Despite the limitations of his new school, Mr. Prempeh worked hard and excelled at his studies. He skipped the 5th grade, and tested into an elite public high school, which he attended. Given the fact that Mr. Prempeh was the primary wage-earner for his family, his educational achievements are nothing short of remarkable. Mr. Prempeh graduated high school when he was fifteen years old.

### b. Life in the United States

After graduating high school, Mr. Prempeh left Ghana at age sixteen to find work to support his family. Mr. Prempeh first went to England, and worked as a security guard at the Royal Air Force Museum. Mr. Prempeh had a hard time making ends meet in England, and lived in continual fear of deportation. After a few months, Mr. Prempeh left England for the United States.

Upon arriving in New York in 2001, Mr. Prempeh began working "off the books" at a 99 cents store. He made $225 a week, and worked over 60 hours, averaging less than $3.75 an hour. Mr. Prempeh knew that he was being exploited, but at 16 years old, with no legal authority to live and work in this country, he had no other options. With his father's abandonment fresh in his mind, Mr. Prempeh was determined to provide for his mother and siblings. He lived in crowded

Hon. Deborah A. Batts
January 4, 2008
Page 16 of 20

apartments with other young people from Ghana, and spent next to nothing, wiring most of his earnings to his mother.

After a short time, Mr. Prempeh was able to "borrow" the social security number of another young man from Ghana who had immigrated legally.[7] Mr. Prempeh used this name and social security number to find a job that would pay him at least minimum wage. From 2002 onwards, Mr. Prempeh worked as a security guard. At the beginning, he was paid $6 an hour. By 2006, he was making $9 an hour.

Mr. Prempeh worked as often as he could, often pulling double shifts, so that he could send more money to Ghana. With the money that Mr. Prempeh sent home, his mother bought a small plot of land and to build a 2-room house for the family. His younger siblings did not have to work and attended a private elementary school.

Mr. Prempeh worked constantly, and dreamt of a day when he would be able to go to college, and become a chemical engineer. He took the SATs and researched engineering programs in the United States. Mr. Prempeh also fell in love with Ayisata Adams, a permanent resident from Ghana whom he met at a ceremony at a local Mosque.

### c. The Offense

In late 2006, when Mr. Prempeh was nineteen years old, the person who had provided Mr. Prempeh his social security number told him that he could not continue to use it. Mr. Prempeh frantically searched for another social security number or an "off the books" job that would allow him to continue sending money home to Ghana. He was desperate, and in his desperation, Mr. Prempeh made the stupid decision to join in a conspiracy to purchase electronic goods using stolen identities. As mentioned above, Mr. Prempeh helped the CW and others open lines of credit, order credit cards, and place orders for laptop computers using the names and identities of individuals without their knowledge or approval.

---

[7] Borrowing or renting social security numbers is a common practice in most immigrant communities. (See *Social Security: Migrants Offer Numbers for Fee*, By Eduardo Porter, The New York Times, June 7, 2005, attached as Exhibit B)

Hon. Deborah A. Batts
January 4, 2008
Page 17 of 20

Mr. Prempeh is a devout Muslim, and it was against his religion and personally shameful for him to be a part of this criminal activity. He hid his actions from friends and family, and struggled to rationalize his choices. "I told myself that I would only do it for a few months, that I would save some money, that I would find another social security number to use, or that my girlfriend and I would marry and that I would become a permanent resident and be able to hold my head high and be proud of myself." (See Statement of Kwame Prempeh, attached as Exhibit C.)

No amount of rationalization could dim the reality of his actions. Mr. Prempeh immediately regretted his participation in the conspiracy and accepts full responsibility for his crimes. His sentiments are best expressed by his statement to the Court:

> "I knew from the beginning that I had made a terrible mistake. I am deeply sorry for what I have done – more sorry than you can imagine. I dishonored by family, and I offended my God. I deserve to be punished for the crimes that I have committed, but my family does not deserve to suffer for my mistakes, and I know that I am responsible for their suffering. For me, this is the worst punishment – much worse than the years that I will spend in prison. I want to lead an honorable life. I want to take care of my family, and be a role model for my brother and sister. I want to go to college and become a chemical engineer. I hope and pray that I have the chance to do this with my life."

(See Exhibit C.)

A letter submitted by Abass Karim, a youth counselor and mentor to Mr. Prempeh, highlights the poverty of Mr. Prempeh's upbringing, as well as the weight of responsibility he carried for his family's support.

Mr. Karim describes Mamobi, Accra as "a community without good sanitary facilities (toilets) drains, hospital water, high illiteracy rate and generally pervasive poverty," where families subsist on less than $1 a day. (See Letters from Friends and Family, attached as Exhibit D.) According to Mr. Karim, Mr. Prempeh sent home $20-$200 a week, and was responsible for the support of his extended family and community, not just his mother and siblings. The money that

Hon. Deborah A. Batts
January 4, 2008
Page 18 of 20

he sent home paid for food, utility and medical bills and school fees. According to Mr. Karim, "Kwame is the main stay of the entire family; if he does not send money someone will be deprived of his right to education, someone will be deprived of access to medical attention, someone will go hungry and someone might die." (See Exhibit D.)

The responsibility that Mr. Prempeh undertook and the pressures he faced are extraordinary, far beyond the cares and concerns of the average American teenager.

### d. Mr. Prempeh's Age at the Time of the Offense

Mr. Prempeh was nineteen years old when he joined the criminal conspiracy for which he awaits sentence. As the Supreme Court recently noted in Gall v. United States, "Immaturity at the time of the offense conduct is not an inconsequential consideration." 2007 U.S. LEXIS 13083, *18 (December 10, 2007)(citing United States v. Gall, 374 F. Supp. 2d 758 n. 2 (SD Iowa 2005). The district court decision in Gall and cited by the Supreme Court, made reference to a recent study by the National Institutes of Health that concluded that human brain development may not become complete until the age of twenty-five. (See Elizabeth Williamson, Brain Immaturity Could Explain Teen Crash Rate, Wash. Post, Feb. 1, 2005 at A01, attached as Exhibit E (summarizing a recent National Institutes of Health ("NIH") study that suggests "that the region of the brain that inhibits risky behavior is not fully formed until age 25")).

The Supreme Court based its most recent death penalty decision, Roper v. Simmons, on studies indicating adolescents are less culpable for their actions than adults. See 161 L. Ed. 2d 1, 125 S. Ct. 1183, 1195 (2005)(quoting a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that "'often result in impetuous and ill-considered actions," and holding that imposition of the death penalty is unconstitutional for those persons who committed the death-eligible crime before the age of eighteen.)

Mr. Prempeh's decision to join the conspiracy was certainly impetuous and ill-considered. Mr. Prempeh is a first-time offender who played a small and short-lived role in a non-violent identity-theft conspiracy that resulted in financial loss. He came to the conspiracy out of desperation,

Hon. Deborah A. Batts
January 4, 2008
Page 19 of 20

and was from the start deeply distraught and remorseful about his participation.

### e. Mr. Prempeh's Fear of Maiming in Ghana

As discussed above, Mr. Prempeh's family is part of an orthodox Sunni Islamic community. Upon his return to Ghana, Mr. Prempeh fears that his hands will be chopped off by the leaders of the community as punishment for his crimes in the United States.

The legal system in Ghana is based on English common law and customary law.  Article 11 of the 1992 Ghana Constitution defines customary law as "the rules of law, which by custom are applicable to particular communities."[8]  In Muslim communities, the reference to customary law is a reference to Islamic law or the Sharia. Islamic law is based upon the rules set forth in the Quran, the Islamic holy book.

Under Sura 5, Verse 38 of the Quran, the punishment for theft is marking or amputation of the hands. "As to the thief, male or female, cut off his or her hands: a punishment by way of example, from Allah, for their crime: and Allah is Exalted in power." Quran 5:38.[9]  Scholars differ on whether Quaran 5:38 requires actual amputation, and different communities have different practices ranging from cutting or marking to full amputation.  In Mr. Prempeh's community, full amputation is strictly enforced.

The punishment that Mr. Prempeh faces upon his deportation to Ghana is far worse than that term of years that he will face behind bars in the United States.

### V.    CONCLUSION

Mr. Prempeh has led a life of great sacrifice and tremendous responsibility.  None of his choices were made for personal enrichment or gain.  He set aside his dream of attending college and becoming an engineer in order to make

---

[8] http://www.ghanaweb.com/GhanaHomePage/republic/constitution.php?id=Gconst4.html

[9] See several translations of the Quran on the University of Southern California Muslim Students Association website: http://www.usc.edu/dept/MSA/quran/005.qmt.html.

Hon. Deborah A. Batts
January 4, 2008
Page 20 of 20

sure that his family had a roof over their heads, food and medical care, and so that his younger siblings could stay in school and would never have to make the same desperate choices.

In light of the foregoing, we respectfully request that this Court impose a sentence of two years, and such other and further relief as may be just and proper.

Thank you for your kind consideration in this matter.

Respectfully yours,

*Elizabeth M. Fink*

SK/GOO/EF/bhs

Elizabeth M. Fink
Sarah Kunstler
Gideon Orion Oliver

CC: AUSA John Zach